United States District Court
Southern District of Texas
**ENTERED**
April 07, 2025
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| SIS, LLC § | |
| § | |
| *Plaintiff,* § | |
| VS. § | CIVIL ACTION NO. 4:22-CV-891 |
| § | |
| ORION GROUP HOLDINGS, INC. § | |
| § | |
| *Defendant.* § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After considering the evidence presented at trial and the arguments of counsel, the Court makes the following findings of fact and conclusions of law. Except where noted, all factual statements are to be considered findings of fact, and all conclusions are to be considered conclusions of law.

### I. INTRODUCTION

This case involves dual contract disputes. The first contract between Plaintiff SIS, LLC ("SIS") and Defendant Orion Group Holdings, Inc. ("Orion") was a Professional Services Agreement ("PSA"), which became effective in June 2010. Under the PSA, SIS provided software consulting services for Orion. After approximately ten years of performance under the PSA, the parties entered into a second agreement, the Software as a Service Agreement ("SaaS Agreement"), which was to last five years. It became effective in 2020. Under the SaaS Agreement, SIS would design and provide Orion with a bespoke software, including Microsoft Dynamics 365 combined with SIS's own intellectual property ("IP"), that Orion purchased as part of a project to implement a new enterprise-wide software system.

Eventually, frustrations and disagreements arose between SIS and Orion regarding the speed of the software implementation, the deliverables that Orion claims were promised, and the quality of SIS's work. In March 2021, Orion stopped payment under the SaaS Agreement after only making one of the five required payments. SIS then sued Orion to recover the remaining payments. As part of Orion's answer, it asserted a counterclaim for breach of warranty under the PSA—Orion claims that SIS's implementation services under the PSA "failed in their entirety."

## II. SIS's Breach of Contract Claim

### A. Findings of Fact

The relationship between the parties began in 2010 when SIS and Orion first entered the Professional Services Agreement relating to various software consulting projects. This dispute began in 2020, after SIS sold Orion on its ability to implement a new Enterprise Resource Planning (ERP) system using licensed Microsoft software combined with SIS's own IP. SIS and Orion worked together to prepare a "proposal" document about the potential services SIS would provide. This document was prepared primarily for Orion to describe the potential relationship with SIS to its Board of Directors.

Orion and SIS then entered a Software as a Service Agreement ("SaaS Agreement"), under which SIS would provide Orion with a Microsoft Dynamics 365 program that was imbedded SIS Software, including, among other things: Microsoft Dynamics 365 for Finance and Operation, Microsoft Dynamics 365 Customer Engagement together with Imbedded SIS Software Modules of Construct 365, Advance Payroll, Construct 365 and Project Cost Management and Construct 365 (the "Bundled Software").

In exchange, Orion agreed to pay SIS $546,579 per year for the five (5) year term of the Agreement. There are numerous terms of the SaaS Agreement that are important to the resolution of this dispute. First, it states that "[t]he project will operate under pre-existing and current

2

professional services agreements in place." Second, it states that SIS will use "commercially reasonable efforts to provide [Orion] with the Services," and "use reasonable efforts consistent with prevailing industry standards to maintain the Services in a manner which minimizes errors and interruptions in the Services." Third, the SaaS Agreement warrants that "the Services will perform in all material respects in accordance with its documentation." Fourth, the SaaS Agreement permits either party to terminate the agreement "if the other party materially breaches any of the terms or conditions of this Agreement." In addition to the obligations of the parties, the SaaS Agreement also contains a significant warranty disclaimer provision. The warranty disclaimer states:

> "HOWEVER, [SIS] DOES NOT WARRANT THAT THE SERVICES WILL BE UNINTERRUPTED OR ERROR FREE; NOR DOES IT MAKE ANY WARRANTY AS TO THE RESULTS THAT MAY BE OBTAINED FROM USE OF THE SERVICES . . . [SIS] DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE."

Orion Ex. 1 at 66.

Orion paid the first-year installment under the SaaS Agreement in March of 2020, and SIS began to undertake its obligations. While there was some evidence to suggest that the software sold under the SaaS agreement may not have complied with Orion's expectations, there was significant evidence to show that both parties understood the SaaS Agreement would be fulfilled over time (months or even years). SIS and Orion were both aware that the Bundled Software and digital test environments purchased by the SaaS Agreement would not be operational or particularly useful during the first two phases of the implementation for which the two parties were contracting. SIS Ex. 3. Nevertheless, Orion began to grow frustrated by the lack of functioning software and other deliverables that were promised in the sales proposal document.

On March 30, 2021, Krstyn Breland of Orion communicated to SIS via video conference that Orion intended to terminate the SaaS Agreement. Breland explained that without the ability to use the software, Orion did not see a path forward with SIS. Orion. Ex. 170. In a follow-up email, Robert Tabb of Orion confirmed with Mark Kershteyn of SIS that Orion had decided to "go a different direction from SIS." Orion Ex. 170. On April 26, 2021, Breland again emailed Kershteyn notifying him that based on Orion's decision to terminate the relationship with SIS, Orion would not be paying for another year of software licensing. Orion ex. 174. As Breland stated, SIS invoiced Orion for the second installment on March 13, 2021, and Orion did not pay that invoice nor any invoice for years three through five. On May 12, 2021, weeks after Orion informed SIS that it would be terminating the SaaS Agreement, SIS chose to purchase a *second* year of Microsoft licenses at the cost of $225,128.25. SIS Ex. 9. Finally, on August 6, 2021, general counsel for Orion sent a formal notice to SIS that it was terminating the contract based on SIS's failure to provide the software services contemplated by the SaaS Agreement.

SIS then sought to enforce the SaaS Agreement by suing Orion for repudiating/anticipatorily breaching the agreement. In its suit, SIS argued that Orion could only terminate the SaaS Agreement if SIS had materially breached its obligations—which it had not. Orion argued that SIS breached the warranty that stated that "the Services will perform in all material respects in accordance with its documentation." SIS argued that Orion could not claim a breach of warranty because it did not provide notice and an opportunity to cure, as required in the SaaS Agreement.

Regarding the breach of warranty, the SaaS Agreement requires that any breach of warranty claim be preceded by "written notice to [SIS] no later than five (5) business days after the last day of that particular month in which the non-complying services were performed." Orion

4

Ex. 1 at 65. The Court is aware of no evidence that such a notice was given to SIS by Orion within the required deadline. Further, performance "in accordance with its documentation" in this context does not refer to the proposal SIS prepared before the contract was executed. In this context, the term "documentation" is understood as a technical term to refer to the software specifications found on the software publisher's website and updated as the software is updated.[1]

Regarding the contractual damages suffered by SIS, Kershteyn testified that SIS had no incremental costs other than the Microsoft Licenses that it would save or not have to purchase for the final three years of the agreement. The Court did not find this evidence to be credible. Based on the total amount owed under the SaaS Agreement, and Kershteyn's bare testimony that there were no incremental costs, Kershteyn totaled the damages claimed by SIS to a net contractual loss of $1,631,316 based on the unpaid contractual balance of $2,186,316 minus the costs saved by not renewing Microsoft Licenses for years three through five—$555,000. Kershteyn also testified that the SaaS Agreement creates a financing fee of 1.5% per month totaling $804.48 per day for the 1,303 days between the due date for the second payment and November 2024.[2] This would increase the total by another $1,048,237.44 making SIS's total damages claim $2,679,553.44.

Other than Kershteyn's testimony, SIS did not produce any financial documents showing expenses as a percentage of sales over time, or financial data related to its operations and costs. There was no internal documentation relating to costs, expenses, or operational structure to support

---

[1]   The testimony supporting this fact was generally unchallenged at trial and during post-trial briefing.

[2]   In Plaintiff's Post-Trial Brief, it misstates the testimony as "between the due date for the second payment and November 18, 2020." Post Tr. Brief at 16. The testimony cited, however, totals the days between the purported repudiation on April 26, 2021 and November 18, 2024—the second day of trial. *See* Nov. 18, 2024 Vol. 2 at 35:19–36:14.

the testimony that no fixed, incremental, variable, or other costs existed associated with operation and potential performance under the SaaS Agreement.

Contradicting Kershteyn's testimony, Orion's expert, Ryan Herrington, established that incremental costs are not always variable costs. Since SIS did not produce a single financial document, however, he was not able to establish whether such incremental costs were present in SIS's operations. Other pieces of evidence that were discovered by Orion, primarily internal SIS communications, actually rebutted Kershteyn's testimony. These internal SIS communications referenced various incremental costs, including labor costs, commissions, packaging, and utilities—all of which were omitted from Kershteyn's testimony. Vol. 8 116:24–22:8; *see also* Orion Ex. 58. For example, Herrington noticed several references to commissions paid to salespeople, and he noted that these would constitute incremental costs throughout SIS's performance under the SaaS Agreement.

In addition, the evidence established that SIS's savings on the Microsoft licensing fees were $185,555 a year, rather than the flat $185,000 a year that Kershteyn testified to and used in his calculation. While the actual difference of $555 a year is comparatively immaterial, the lack of precision when the exact numbers were readily available also undercuts Kershteyn's credibility. Based on the above, the Court finds that Kershteyn's testimony was less than credible in this regard and was directly rebutted by the evidence that SIS brought forward. His testimony in this regard was *at best* imprecise and at worst bordering on the unbelievable.

### B. Conclusions of Law

As the SaaS Agreement's terms state, Georgia law governs the dispute over the parties' contractual obligations and disputes. The elements of a breach of contract claim in Georgia include: (1) a valid contract, (2) a material breach of its terms, and (3) resulting damages. *Norton v. Budget Rent A Car Sys., Inc.*, 705 S.E.2d 305, 306 (Ga. Ct. App. 2010). To prevail on a breach

6

of contract claim, a party must prove that it "has the right to complain about the contract being broken." *Niloy & Rohan, LLC v. Sechler*, 335 Ga. App. 507, 782 S.E.2d 293 (2016). Whether the parties performed under the SaaS Agreement is governed by a substantial compliance standard. See O.G.C.A § 13-4-20 ("Performance, to be effectual, must be . . . substantially compliant with the spirit and letter of the contract and completed within a reasonable time."); *Forsyth County v. Waterscape Services, LLC*, 303 Ga. App. 623, 633, 694 S.E.2d 102 (2010) ("A breach is material when it is so substantial and fundamental as to defeat the object of the contract.").

To start, the PSA, SaaS Agreement, and all Work Orders were valid, binding contracts. Further, based on the language of the SaaS Agreement, SIS's failures to provide "live" software and operating environments by March 2021 did *not* constitute a material breach of the agreement's terms. The SaaS Agreement disclaimed all warranties that the Services (or software) provided would function, or that it could be used for a particular purpose.[3] The SaaS Agreement also only obliged SIS to make "commercially reasonable" efforts to "provide [Orion] with the Services." Orion Ex. 1 at 64. Finally, while the presentation of the SaaS Agreement to Orion as an appendix to the 64-page proposal document could have been grounds for a fraud or inducement claim by Orion, no such claim was made. As such, based on the language of the SaaS Agreement, the Court finds that, despite the manner in which the pages are numbered, the proposal document does not contain a binding set of terms and conditions relating to the SaaS Agreement. Thus, the entire agreement between SIS and Orion related to the Software as a Service relationship is contained within the separately demarcated "SaaS Agreement" and Work Order 1.

---

[3] Despite raising allegations about fraudulent misrepresentation/equitable estoppel in the joint pretrial order and various motions, Orion did not argue estoppel at trial or mention it once in the post-trial briefing. As such, the Court finds this affirmative defense to be waived.

7

Further, Orion's contention that "documentation" referred to the deliverables promised in the Proposal is unavailing. As stated above, the Court finds that "documentation" in the context of the SaaS Agreement refers solely to the technical specifications of the software provided on the website of the software publisher. This does *not* refer to the 61-page proposal originally attached to the SaaS Agreement. As such, without any contractual obligation for SIS to actually deliver a software product, much less the viable or functioning software product fit for a specific purpose that Orion seems to have expected, there is no factual basis on which to find that SIS materially breached the SaaS Agreement. Therefore, since SIS did not materially breach the SaaS Agreement, Orion's termination of the SaaS Agreement, via the April 26, 2021 email from Breland, constitutes a breach of the SaaS Agreement.

In a case of anticipatory breach, a party may "sue and recover [its] entire damages." *Jinright v. Russell*, 123 Ga.App. 706, 182 S.E.2d 328, 330 (1971); *see also* John Kimpflen, 7 GEORGIA JURISPRUDENCE, BUSINESS AND COMMERCIAL LAW: CONTRACTS § 5:98 (2020) ("Where there has been an anticipatory breach of a contract, the injured party is not limited to a recovery of the mere value of the services which such party has performed; the injured party may recover the entire present value to the injured party of the contract."). In general, "[t]he object of giving damages to the plaintiff is to put him in as good a position as if the defendant had fully performed the contract." *PMS Constr. Co. v. DeKalb Cty.*, 243 Ga. 870, 257 S.E.2d 285, 288 (1979); *Caradigm USA LLC v. PruittHealth, Inc.*, 964 F.3d 1259, 1273 (11th Cir. 2020).

In proving the "lost profits" damages that SIS seeks, Georgia law requires *that the party seeking the remedy* prove their right to recover the damages by "subtracting from the contract price the amount which full performance would have cost the contractor." *Franklin v. Demico*, 179 Ga. App. 775, 779 (1986); *see also Williams v. Kerns*, 153 Ga. App. 259 (1980). The fact finder "must

be provided with figures establishing the business's projected revenue as well as its projected expenses." *Legacy Academy v. JLK, Inc.*, 330 Ga. App. 397, 404, 765 S.E.2d 472 (2014). Thus, although "[e]xact mathematical certainty is not required," in order to prove lost profits in a breach of contract action, "one must show the probable gain with *great specificity* as well as expenses incurred in realizing such profits; in short, the gross amount minus expenses equals the amount of recovery." *Triad Drywall, LLC v. Bldg. Materials Wholesale, Inc.*, 300 Ga. App. 745, 686 S.E.2d 364 (2009) (emphasis added). Finally, under Georgia law, a plaintiff has a duty to mitigate damages and may not recover losses that could have been avoided through reasonable efforts. *Gen. Elec. Capital Corp. v. Nucor Drilling, Inc.*, 551 F. Supp. 2d 1375, 1381 (M.D. Ga. 2008).

SIS did not adequately prove its (net) damages claim. Under Georgia law, to successfully claim lost profits, SIS must provide evidence of the total amount owed by Orion under the agreement and subtract all incremental costs that SIS would have been required to pay throughout SIS's performance under the SaaS Agreement. Here, SIS claimed—but failed to prove—that there were no incremental costs associated with its performance under the SaaS Agreement.

First, Kershteyn's testimony was not supported by any evidence and was directly contradicted by internal emails. Kershteyn simply stated that there were no incremental costs, but did not have sufficient evidence to support that statement. More importantly, there were numerous internal SIS communications referencing various categories of incremental costs.

Second, though a comparatively minor issue, as noted above, Kerhsteyn "rounded down" when calculating the costs saved by not purchasing the Microsoft licenses for years three through five when the appropriate number was plain on the face of the exhibits. Though the overall outcome of this miscalculation was comparatively marginal, the lack of accuracy further undercuts his credibility as a witness.

Third, Kerhsteyn did not effectively address the $225,128.25 purchase of the Microsoft licenses for year two that occurred weeks after Breland and Tabb had repeatedly informed SIS that Orion was terminating the agreement. Under Georgia law, a plaintiff has a duty to mitigate damages and may not recover losses that could have been avoided through reasonable efforts. *Gen. Elec. Capital Corp. v. Nucor Drilling, Inc.*, 551 F. Supp. 2d 1375, 1381 (M.D. Ga. 2008). Kershteyn's testimony and the post-trial briefing did not provide any credible justification for the license purchase if—as SIS argued and as the Court has found—the SaaS Agreement was repudiated weeks earlier. Thus, SIS failed to prove its entitlement to the total amount it seeks pursuant to the SaaS Agreement.

SIS did, however, establish as a matter of law that Orion's breach of the SaaS Agreement occurred *after* payment on the second-year installment was invoiced and due. This was evident on the face of the SaaS Agreement and was adequately supported by testimony. As such, SIS is owed the second-year installment under the SaaS Agreement in the amount of **$546,579.**

Further, the SaaS Agreement does contain a financing fee of 1.5% per month. Under Georgia law, however, the highest interest rate permitted by law is 1.33% monthly interest. *See* GA. CODE § 7-4-2. It has been **1,456** days between the date the invoice became due—April 12, 2021—and the entry of this order. With the contractually agreed-upon interest, Orion's total amount due to SIS is **$894,559.04.**

### III.    Orion's Counterclaim for Breach of Warranty

#### A. Findings of Fact

Orion and SIS entered the Professional Services Agreement on June 10, 2010, which governed the software consulting services that SIS offered Orion. The PSA includes the following:

> **Obligations of Consultant [SIS]:** In its performance of the Services hereunder, [SIS] shall at all times comply with and abide by the terms and conditions set forth in this Agreement and all applicable policies and procedures of [Orion]. [SIS] shall

10

further perform the Services in accordance with all applicable laws, rules and regulations and industry standards."

Orion Ex. 2. This obligation is expressly incorporated into all later executed Work Orders. SIS sold its ability to implement a new ERP system for Orion using licensed Microsoft software combined with SIS's own IP. Orion then, in addition to purchasing the software through the SaaS Agreement, contracted with SIS to design and implement the software into Orion's operations ("the ERP Project"). The ERP Project was set to begin in Q1 2020 but was delayed due to the COVID-19 pandemic. The parties entered only one Work Order under the PSA relating to the ERP Project. Orion paid all year-one invoices for the ERP implementation services provided under the PSA, totaling $571,457.

The Work Order entered by the parties governed the mobilization and analysis phases of the ERP Project. The obligations of SIS during the mobilization phase included, among other things: (1) infrastructure configuration and deployment of required D365 instances; (2) configure main project tools and portals including DevOps, MS Teams; (3) discovery sessions; (4) Analysis Scope Finalization (including development of detailed statement of work for the subsequent phases of the project); (5) development of detailed Project Plan for analysis phase; (6) planning and scheduling activities Including on-site and offsite (virtual) meetings; and (7) any other activity required by the project and approved by Orion, LLC. The Work Order stated specifically that the SIS would perform an "information download from Dynamics SL consulting team to Dynamics 365 so that every consultant on the project will be educated on all [SIS] know[s] about Orion. This item will be performed free of charge as a non-billable activity." Orion Ex. 1 at 66.

Additionally, the Work Order stated SIS's obligations during the analysis phase of the project included, but was not limited to the following: (1) working on Orion requirements classification; (2) executing predefined and pre-scheduled Workshops per each Functional

11

Workstreams (onsite at Orion's Houston office and remote); (3) collecting Business and System Requirements and Business Processes and Scenarios during scheduled Workshops; (4) clarifying, providing initial solutions and approving all details with SME; (5) creating Solution Design Documents (Implementation Strategies) documents and all other deliverables identified in the scope of this SOW; (6) providing all required Technical, Project Management, Industry and Engagement services approved with Orion. Orion Ex. 1 at 66.

Almost immediately, and unrelated to the Covid delays, the ERP Project faced significant challenges. First, SIS failed to provide strategy documents throughout the ERP project. There were six strategy documents that SIS was obligated to deliver under the Work Order by December 10, 2020, which included the Data Migration Strategy, the Environment Management Strategy, the Security Strategy, the Testing Strategy, the Development Strategy, and the ISV/Integration Strategy. Orion Ex. 83. SIS never delivered these documents to Orion. This was confirmed by internal emails between the SIS employees assigned to the Orion project. Breland testified these were imperative for Orion's staffing and structuring. Vol. 7, 70:13-72:2. In an internal SIS email dated January 12, 2021, Victor Lesiv informed Bob Green (both of SIS) that SIS did not have the strategy documents for Orion and that SIS was "not ready to deliver." Orion Ex. 125. Lesiv further informed Green that the involvement of the person assigned to the strategy documents was "not planned nor executed properly" and that it would take a lot of time for SIS to complete the strategy document deliverables for testing, training, data migrations, and integrations. *Id.*

Second, SIS failed to develop a detailed project schedule. SIS failed to ever develop a detailed project schedule with detailed tasks, resource allocations, sequences of events to deliver activities, dependencies, and a critical path. Vol. 7, 62:9-63:16; 109:19-110:4; 124:18-125:11. Lesiv further expressed his frustration in an internal email and threatened to "put a complete halt

to Orion project" on December 8, 2020 because, despite asking Green for a "detailed plan," Lesiv had not seen anything so far "outside of that high level gant [sic] chart." Orion Ex. 105.

Third, SIS failed to follow its own internal process for resolving "Critical Path Decisions (CPD)" through "written notice of decision (NOD)" requests, which is SIS's formal process of resolving issues or pending decisions with key dependencies that could impact the critical path and SIS's ability to timely deliver. Orion Ex. 1 at 10. Kershteyn acknowledged that it was industry standard to follow such internal processes. Vol. 4, 43:20-25. SIS also failed to establish an Architectural Review Board, which was SIS's own process for addressing changes to the scope of work, as well as managing and tracking architectural changes, issues, risks, and decisions. Vol. 7, 109:15-17. The Architectural Review Board was a key component of SIS's change management approach detailed in the sales proposal, which Mr. Kershteyn admitted was industry standard. Orion Ex. 1 at 9; Vol. 4, 43:20-25. Further, SIS failed to adhere to its own risk management process despite representing that it would proactively implement a Risk Management process to identify and mitigate potential project risks. Orion Ex. 1 at 46–47; Vol. 7, 109:19-110:4. SIS's risk management process was described in the Proposal, and Kershteyn admitted it was the industry standard, but was never formalized and "was not being reviewed . . . ." Orion Ex. 1 at 46–47; Vol. 4, 43:20-25; Vol. 7, 124:18-125:11.

Fourth, SIS failed to develop a Business Process Inventory which was a key deliverable in the Analysis Phase to support the collection of business process. Orion Ex. 1 at 55, 66; Vol. 7, 110:5-14. Breland testified that SIS "never laid out in a formal process library in a way that could be tracked back," which was "another item that was impeding ability to see how the program would be delivered end-to-end." Vol. 7, 110:5-14.

Fifth, SIS failed to deliver the ERP Software necessary for the first two phases. Orion's expert, Crouse, testified that no evidence in the record indicated that SIS ever provided Orion with access to the Microsoft licenses it had purchased. Vol. 9, 52:11-19.

Sixth, SIS failed to perform the necessary "commingling" process to integrate the licenses into its environment, meaning that Orion could not access the promised functionality of either the Microsoft software or SIS's Construct 365 system. *Id.* at 55:21-57:1. Crouse explained that without this critical step, the licenses remained under Orion's control but could not be used in any meaningful way, as Microsoft had not been notified to link the licenses to SIS. *Id.* This failure directly contradicted SIS's contractual obligations and rendered the environments it claimed to have provided useless for their intended purpose. Vol. 7, 125:12-126:8; Orion Ex. 155; Orion Ex. 174; Vol. 9, 55:21-57:1.

Finally, SIS failed to provide the Human Resources and Payroll Solution Design Documents ("SDDs") specifically listed in the Work Order. Vol. 7, 72:16-73:5. These SDDs had deliverable deadlines months before the termination of any agreement and, based on the testimony at trial, reflected a significant failure of SIS to deliver any sort of real work product to Orion.

Except where noted, neither party successfully articulated a specific set of practices or deliverables that define "industry standards," regarding ERP implementation projects. Based on expert testimony, "industry standards" do not necessarily require the completed delivery of a "working, customized ERP system." Nevertheless, the testimony from both parties' experts did seem to agree that industry standards would require an ERP implementation to generally meet any agreed-upon deliverables, to have internal safeguards and process guidelines, to reflect clear communication, and be based on truthful representations of a consultant's capabilities and work products. These standards were not met by SIS.

In fact, there were several examples of misrepresentations regarding the software capabilities that SIS claimed the ability to provide but that, in reality, did not exist. Orion Ex. 151; Vol. 7, 102:3-105:24; Vol. 8, 41:17-43:14. Breland testified that the functionalities depicted in the screenshots from SIS's sales presentation did not exist and SIS's Gary Bonuso was forced to concede as much during the February 9, 2021 workshop to address Orion's concerns. Vol. 7, 92:18-93:18. Thus, while certain deliverables may not have been within the consensus industry standards as a matter of course, intentionally misleading statements about SIS's ability to actually provide and implement certain products certainly fall below the standard of conduct expected in the industry.

As noted above, after Orion terminated the SaaS Agreement, and SIS filed suit, Orion brought a counterclaim for Breach of Warranty based on SIS's failure to perform the ERP Project in accordance with industry standards, as the PSA requires. Orion put on evidence that it was entitled to $1,152,468 in compensatory damages on the basis of its counterclaim. Orion requested $536,236.24 based on the amount Orion paid for the ERP project's first two phases under the Work Order, and $616,232.21 based on the total amount it paid to SIS pursuant to the SaaS Agreement.

As with its case-in-chief, SIS's primary witness on the progression of the ERP Project was Kershteyn, its CEO—Kershteyn's testimony, however, was less than credible for several reasons. First, his testimony directly contradicted much of the internal communications within SIS at the time, reflected in emails put into evidence by Orion. Second, Kershteyn testified on direct examination that he had consistent, personal knowledge of day-to-day activities, but he was successfully impeached by his prior deposition testimony in which he explicitly stated that he was not involved in the day-to-day activities of the ERP Project. *Compare* Vol. 1, 71:15-72:2 *with* Vol. 4, 4:3-6:11. As such, the Court finds that Kershteyn did not have the actual personal knowledge of

SIS's day-to-day operation, and his testimony was based on inferences drawn in his own favor. The Court found Orion's evidence relating to the ERP Project to be more compelling.

### B. Conclusions of Law

"When a warrantee brings a breach of express warranty claim, the terms of the written warranty control." *Culberson v. Mercedes-Benz USA, Ltd.*, 274 Ga. App. 89, 92, 616 S.E.2d 865, 868 (2005). When interpreting a contract under Georgia law, "a contract must be construed as a cohesive whole that gives meaning to all of the parts and renders none superfluous." GA. CODE ANN. § 13-2-2(4). The Court finds that SIS's conduct throughout the ERP Project did not meet "industry standards" for ERP implementation projects. Since the PSA warranted that SIS would operate in accordance with such standards, SIS breached the explicit warranty of the PSA.

The terms of the PSA, executed ten years before the SaaS Agreement, governs the Work Orders controlling the ERP Project. The PSA explicitly states that its terms control the Work Orders in existence at the time of the PSA and:

> "Any services [that] are described in one or more Work Orders executed by the parties hereto. Subsequent Work Orders shall NOT invalidate any Prior Work Orders, but rather shall be considered additions/deletions of scope of Services and Budgetary Estimates."

Orion Ex. 2 at 1. Accordingly, all Work Orders for any future consulting or implementation services are governed by the PSA's warranty that SIS would perform any such services "in accordance with all applicable laws, rules and regulations and industry standards." Orion Ex. 2 at 2. Finally, because the PSA governed the ERP Implementation Project, and the SaaS Agreement only governed the provision of the software itself, the SaaS Agreement's warranty disclaimers do not negate the warranties made in the PSA about the ERP Project.

At the outset, Orion did not need to provide notice and an opportunity to cure the defect as a condition precedent to its claim. "Conditions precedent, which are not favored in interpreting

contracts, are created by language such as 'on condition that,' 'if,' and 'provided,' or by explicit statements that certain events are to be construed as conditions precedent." *Choate Constr. Co. v. Ideal Elec. Contractors*, 246 Ga. App. 626, 628 (2000) (citation omitted). "If the contract's terms are clear and unambiguous and do not clearly establish a condition precedent, [a court] cannot construe the contract to create one." *Id*. While the PSA contains a notice and opportunity to cure provision regarding billing disputes, the PSA does not explicitly create any such condition precedent for breach of warranty claims, especially when made in response to a lawsuit filed by the other contracting party. Thus, Orion may bring its breach of warranty claim despite not having provided the notice required in the other provision of the PSA.

Given SIS's conduct throughout the first two phases of the ERP Project as defined in the Work Order, SIS did *not* operate in accordance with industry standards. While the failure to completely produce an operational ERP system tailored to Orion's needs was not necessarily required in the mobilization and analysis phases of the ERP Project, the numerous project failures, inability to communicate effectively, failure to plan, and material misrepresentations that SIS made fell below the appropriate industry standards.

Based on SIS's failure to perform in accordance with industry standards as obligated under the PSA's warranty, Orion seeks $1,152,468.45 in damages. Orion's damages expert reached this number by adding up the total amount Orion paid SIS under the SaaS Agreement ($616,232.21) and the total amount Orion paid SIS in invoices under the ERP Project Work Orders ($536,236.24) from March 30, 2020 to March 30, 2021. *See* Orion's Post-Trial Brief, at 45. Orion argues that, because the breach of the PSA resulted in the termination of both the PSA and the SaaS Agreement, it should recover the total amount paid on both contracts.

Completely unaddressed by Orion, however, is Limitation of Liability provision contained in the PSA itself. *See* Orion Ex. 2 at 4. This provision directly addresses what damages would be available if SIS breached the PSA's warranty provision. This limitation of liability, in pertinent part, reads as follows:

> **Limitation of Liability.** [SIS]'s <u>total liability under this Agreement shall be limited to all fees paid by [Orion] to [SIS] for the Services, hereunder</u>. In no event shall either party, its licensors, parents, affiliates, subsidiaries, or any of their employees, agents, officers, managers, or directors, be liable for any special, incidental or indirect damages or for any consequential damages (including loss of data or profits) arising out of this Agreement or in connection with the Services provided under this Agreement even if it is informed of their possibility.

Orion Ex. 2 at 4 (emphasis added). This provision contractually limits Orion to recovering only the fees it paid to SIS for the work done pursuant to the PSA—in other words, the Work Orders governing the ERP Project. This language, therefore, precludes Orion from recovering the amount it paid to SIS under the SaaS Agreement as damages for the breach of the PSA's warranty. As such, the total amount that Orion can recover for the breach of the PSA's warranty is the total amount it paid SIS pursuant to the ERP Project Work Orders between March 30, 2020 and March 30, 2021. This totals to **$536,236.24**. Orion Ex. 182 at 30.

## VI. Conclusion

Based on the foregoing, the Court finds that Orion is liable to SIS for breaching the SaaS Agreement and awards **$894,559.04** in damages and contractual pre-judgment interest. Additionally, the Court finds that SIS is liable to Orion for breaching the PSA's warranty and awards **$536,236.24** in damages plus any post-judgment interest at a rate to be specified in the Final Judgment. Thus, the Court finds that SIS is entitled to **$358,322.80** in monetary damages. The parties have agreed that the issue of fees and costs will be subject to any post-judgment briefing that either side chooses to file. Plaintiff may file such a brief or motion, if it does so by April 30, 2025. Defendant would then have until May 14, 2025 to respond. Any reply from Plaintiff

must be filed by May 21, 2025. The Court is entering a separate order setting out the Court's Final Judgment as required by Rule 58(a).

Signed on this 7th day of April, 2025.

Andrew S. Hanen
United States District Judge